WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christy Larson,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Hartford Insurance Company of the Midwest, et al.,<br><br>　　　　　　　Defendants. | No. CV-12-02356-PHX-NVW<br><br>**ORDER** |

Before the Court are the parties' respective motions for summary judgment (Docs. 108, 116), responses (Docs. 120, 122), and replies (Docs. 125, 127). The parties also presented oral argument on June 19, 2014. For the following reasons, Plaintiff's Amended Motion for Partial Summary Judgment (Doc. 108) will be denied, and Defendants' Motion for Summary Judgment (Doc. 116) will be granted in part and denied in part.

**I.   BACKGROUND**

The following facts are undisputed except as noted. In July 2010, Plaintiff Christy Larson managed a Denny's Restaurant in Sierra Vista, Arizona. Doc. 124 at 2. On July 28, she hurt her back while painting the Denny's break room as directed by her supervisor, Kelly Sturm. She went home and felt pain in her legs. Doc. 109 at 3. Larson informed Sturm of the injury the next day. *Id.* at 13. She worked July 29, 30, and 31 in pain. *Id.* at 3.

1  Larson sought treatment.  On August 1, she went to the Sierra Vista Regional
2  Medical Center Emergency Room "because [she] couldn't take the pain anymore" and
3  "wasn't getting any better."  *Id.*  The clinician diagnosed back pain and sciatica and
4  prescribed pain medication.  Doc. 109-7 at 3; Doc. 124-2 at 25, 31.  The parties dispute
5  whether Larson reported the injury as work related.  Each has submitted a "Triage
6  Information" sheet, one indicating the injury occurred at work and one not so indicating.
7  *Compare* Doc. 109 at 17 *and* Doc. 109-7 at 2 *with* Doc. 124 at 7 *and* Doc. 124-2 at 32.  On
8  August 5, Larson went to a second medical provider, High Desert Clinic.  Doc. 109 at 4.
9  The High Desert Clinic records indicate the cause of injury was "working long hours, 1½
10 weeks ago was unloading truck then last week was painting[.]"  Doc. 109-10 at 3.  Larson
11 was referred to an orthopedic surgeon.  Doc. 109-3 at 3.  She returned to the Sierra Vista
12 facility on August 12 and reported back pain from stepping off a chair while painting the
13 break room.  The attending physician signed a "Worker's & Physician's Report of Injury"
14 for the Industrial Commission of Arizona.  Doc. 109-9 at 2.  The parties dispute whether the
15 facilities filed a workers' compensation claim with the Industrial Commission on Larson's
16 behalf, *compare* Doc. 109 at 4 *with* Doc. 124 at 8, but Defendants do not dispute that the
17 Industrial Commission subsequently sent a formal Notice of Injury to Defendant Gallagher
18 Bassett.  Doc. 124 at 8.

19 As a Denny's employee, Larson benefited from an insurance policy issued by
20 Defendant Hartford Insurance Company of the Midwest.  Defendant Gallagher Bassett
21 served as claims handler.  Doc. 109 at 1.  Gallagher Bassett received Larson's workers'
22 compensation insurance claim on August 2, 2010.  Doc. 109-3 at 2.  On August 9, Gallagher
23 Bassett supervisor Heather Bilodeau entered the following notes in Larson's electronic
24 claim file:

25 > This claim needs to be transferred to the indemnity office.  The F/U notes
26 > total temporary disability 8/5/2010 until seen by ortho.  The GM, Kelly
   > [Sturm,] questions this as [Larson] said she was on a ladder painting in the
27 > break room and had pain in her back and legs when she went home.  [Larson]
   > is a manager, worked the next couple of days and did not report the incident
28 > until 2 days later.

*Id.* at 3. The same day, Bilodeau assigned the claim to adjuster Tina Gustafson. Doc. 109 at 5.

Within a few hours, Gustafson began investigating the claim. She first contacted Sturm. Gustafson's notes from this conversation reflect that Sturm "doubt[ed] the claim. [Larson] told him she was just standing on a step stool in their break area painting and felt pain in her back. She did not fall or twist her back. She did not report this right away." Doc. 109-3 at 4. Based on this initial conversation, Gustafson concluded she "needed to complete an investigation to find out what was going on." Doc. 124-5 at 16. She "needed to do an investigation" because "there were not consistent stories as to what happened. [Larson] was just standing there and felt pain in her back." *Id.* at 17. Gustafson "wanted a second opinion" because Larson "didn't really do anything according to them. She was— she just started having pain." *Id.*

Gustafson then contacted Larson, who

> state[d] she was standing on a general chair (not a ladder as the FROI states) in the break room area painting a wall . . . . She stepped off the the [sic] chair onto her right foot and began experiencing pain. When she got home she had to lay down the pain was so bad. She went into work the next day and reported this to the GM Kelly [Sturm]. She explained the issues w/ Kelly and Kelly was very upset about this and did not want to deal with it nor did he send her to a clinic. She went to the ER on her own. She denies any prior back injuries or problems[.] She only had one prior claim for a minor knee injury w/ minimal txt, no time loss and no settlement or impairment. She has been out of work since seen at ER on 8-1-10.

Doc. 109-3 at 4. After a subsequent conversation with Larson, still on August 9, Gustafson noted Larson had been seen at the Sierra Vista and High Desert facilities for severe pain in her lower back. Gustafson informed Larson she could not authorize medical treatment at that point and instead needed to schedule an independent medical review (IME) and obtain her medical records. Doc. 109-2 at 6; 109-3 at 4. Gustafson's notes from that conversation conclude, "She was not happy and advised she is getting an atty." Doc. 109-3 at 5.

That same day, Gustafson informally decided to deny Larson's claim pending further investigation. She entered the following in the claim file: "Claim being investigated.

- 3 -

1  Mechanism of inj[ury] questionable at this time, need an MD opinion. [Larson] did not
2  report this immediately[. Received Denny's] approval to deny and set up IME[.]" *Id.*
3  Gustafson subsequently testified she did not need Denny's approval.

4  Between August 9 and August 11, Gustafson added to Larson's file emails between Gustafson and two of Denny's risk managers. Therein, Gustafson relays that Larson "did indicate she was painting their break room wall just as Kelly told me. She was on a general chair though and not on a step ladder." *Id.* at 6. The three women agree on denying the claim. Gustafson stated, "The back problems/symptoms do not seem consistent to me w/ the mechanism of injury," and one of the risk managers reported that she learned from Sturm that Larson had taken unprescribed oxycodone at some point. This risk manager noted that "since there was an actual incident it will be hard to follow thru [sic] with denial of claim," but wondered whether they could "stand on the fact that she should not have been taking these non-prescribed scripts while at work." *Id.* at 8–9.

14  At her deposition, Gustafson testified she decided to deny Larson's claim on August 9 "to complete the investigation." She "needed to obtain all her prior medical records, the current medical records, and also set up an independent medical evaluation." Doc. 109-2 at 7. Gustafson was also motivated by an Arizona statute, A.R.S. § 23-1061(M), which deems claims accepted within 21 days of notification from the Industrial Commission unless they are denied. Doc. 109-2 at 9, 11. Nonetheless, Gustafson testified she could not recall why she informally decided to deny the claim before receiving the triggering Industrial Commission notice. *Id.* at 7. She also testified the allegations regarding oxycodone were unimportant in evaluating the claim. Doc. 121-3 at 29. Indeed, despite perceiving inconsistencies regarding the injury, Gustafson testified she did not initially view the claim with suspicion. Doc. 124-5 at 16–17. Similarly, Gustafson testified the "Form 101" from Larson's file, completed by or on information provided by Denny's, did not indicate the validity of Larson's claim was in doubt. Doc. 109-2 at 7.

27  Subsequently, Gustafson ordered medical records and set an IME for September 14. Doc. 109 at 5–6. Gustafson's notes reflect that she set the IME because the injury appeared

inconsistent with stepping down from a chair. Doc. 109-3 at 8. Gustafson similarly testified she wanted an IME "[t]o see what was going on with her, to get an opinion on causation, the diagnoses being consistent with the mechanism of injury." Doc. 109-2 at 6.

On September 7, Gallagher Bassett issued a formal denial of Larson's claim, one week prior to the IME and nine days before the claim would be statutorily deemed accepted. *Id.* at 9, 11. Gustafson testified she denied the claim before both "[b]ecause we were still investigating the claim, and our IME wasn't until the 14th. There was no way our investigation was going to be complete by [the statutory deadline]." *Id.* at 11; *see also* Doc. 124-5 at 22–23 (Gustafson testifying, "[M]ore often than not we can't get our investigation complete because sometimes it takes three to four weeks just to even get an independent medical evaluation in. Obtaining prior medical records and the current medical records, sometimes that takes a very long time"). In addition to the IME report, Gustafson "had a very difficult time getting the medical records." Doc. 109-2 at 11. According to her, Gallagher Bassett "sent [Larson] a medical authorization and would have sent her a request for prior doctors and clinics that she has treated with, and I don't believe we got that, so we were still completing. It's a part of our investigation." *Id.* The dispute over medical records authorization is elaborated below.

On September 9, Gustafson documented that she received medical records from Larson's trips to the Sierra Vista and High Desert facilities. Doc. 117 at 3. Gustafson recorded Larson's report to the High Desert Clinic that she "injured herself working long hours and unloading a truck and painting." Doc. 117-2 at 11. That same day, Gustafson engaged an investigator to "attempt to secure a signed authorization and list of prior health care providers as well as pursue video surveillance" to ensure Larson acted consistently with her reported injury. Doc. 117 at 3; Doc. 121-3 at 37. The investigator surveilled Larson for three days beginning September 17. Doc. 121-3 at 37; 109-3 at 11. Gustafson did not recall whether the surveillance ever discovered behavior inconsistent with Larson's reported injury. Doc. 121-3 at 37.

1   On September 19, Gustafson sought treatment again, this time at John C. Lincoln Hospital. The examiner noted a "history of chronic back problems." Doc. 117-2 at 22. The examiner also noted that Larson "was at work painting her restaurant and noted the flare up of the pain" and that the injury was work related. *Id.* Larson disputes both that she reported any prior lower back injury at John C. Lincoln and that Gallagher Bassett obtained this information prior to mid-December 2010. Doc. 121 at 13–14; Doc. 121-9 at 130.

By letter dated September 20, the IME doctor reported that Larson's "history and diagnosis [were] causally related to the injury of 7/28/10." Doc. 109-14 at 9. She continued: "There is no evidence in the medical records available for review or the information provided by the examinee that suggests any underlying or preexisting condition that would have caused these symptoms anyway." *Id.* at 10. Based on Larson's account, the doctor also ruled out that unloading a truck caused the injury. *Id.* at 9. The doctor noted Larson was "extremely motivated to return to work. There are no findings that suggest other issues might play a role in this examinee's condition." *Id.* at 10–11. She concluded, however, that Larson was "not capable of returning to work at this time, or until her pain is better controlled. She is unable to tolerate sitting, standing or walking secondary to pain." *Id.* at 10. The IME doctor referred to and relied on the medical records from the Sierra Vista and High Desert facilities. *Id.* at 8–9.

On September 22, Gustafson wrote to Denny's risk managers, "I'm waiting on the IME but I have heard this MD may have related [the injury] to this alleged incident. As I indicated, I'm not accepting the claim due to the conflicting information in the medical reports . . . specifically the part where she tells the MD she injured herself unloading her truck." Doc. 109-3 at 12. Gustafson also noted Larson had recently moved, but it appears she was referring to Larson's move into her parents' home in September after the injury occurred. *Id.* at 11–12.

Meanwhile, Larson had hired a lawyer, Sarkisov, to challenge the claim denial before the Industrial Commission. Doc. 109 at 8; Doc. 121 at 10. The parties dispute whether Gallagher Bassett's administrative counsel, Baker, conceded the compensability of

1  the claim during the Industrial Commission litigation.  *Compare* Doc. 109 at 8 *with* Doc.
2  124 at 17.  Pursuant to that litigation, Larson served interrogatories regarding the claim
3  denial.  Gallagher Bassett disputes that Gustafson ever saw the interrogatory responses.  But
4  the responses themselves indicate the claim was formally denied because "Applicant's low
5  back complaints are not related to her alleged industrial injury . . . ."  Doc. 109 at 9.  The
6  responses elaborated, "Defendants contend that the applicant's back complaints are not as a
7  result of her job activities with the defendant employer."  *Id.*

8  From the outset, Gallagher Bassett had sought and Larson resisted attempts to obtain
9  the latter's medical history.  Gallagher Bassett requested medical authorization and prior
10 providers no later than August 11.  Doc. 117 at 3.   Larson contends that to the extent
11 Gustafson sought authorization for medical records at this point, it was only for prior claims
12 filed with the Industrial Commission—records to which the carrier already had statutory
13 access without authorization.  Doc. 121 at 5.  On September 9, Gallagher Bassett's
14 investigator attempted to obtain authorization.  Doc. 117 at 3.  Larson declined to sign the
15 form and asserts that it was "blank."  Doc. 121 at 10.

16 On September 24, Gustafson learned from an "Index Bureau" search of prior claims
17 that may have been related to Larson.  Doc. 117 at 4.  The search revealed one claim made
18 by someone with a similar name, one by a claimant with an identical social security number,
19 five by claimants with similar addresses, and three claims flagged for "multiple reason [sic]
20 found."  Doc. 117-2 at 15.  Ultimately, only three of the claims involved Larson.  One was
21 for a car accident in 2000, which Larson had previously reported to Gustafson, and two
22 were for slip and falls in 1995 and 2005.  Doc. 109-2 at 113–15.

23 On October 7, Gustafson received the IME report but maintained the denial because
24 Larson still had not authorized Gallagher Bassett to obtain certain medical records.  *Id.*  On
25 October 12, Baker again sought authorization on Gallagher Bassett's behalf.  Doc. 117 at 4–
26 5.  On October 20, Sarkisov provided medical records release authorization for the Sierra
27 Vista and High Desert facilities and questioned the necessity of broader authorization.  Doc.
28 121 at 10–11.  Receiving no answer, Sarkisov advised Baker in a November 9 letter that he

1 questioned specifically the relevance of the Index Bureau search claims, some dating back 10 and 15 years. He agreed, however, to obtain the records to determine their relevance. Sarkisov requested these records on November 10. *Id.* at 12. On November 15, an administrative law judge at the Industrial Commission directed Sarkisov to obtain the records and allow Baker to review but not keep them. Doc. 109 at 11; Doc. 124 at 22. Receiving no response from his November 10 request, Sarkisov requested records again on December 3. Doc. 121 at 12. He made some records available to Baker on December 22. *Id.* at 18. Gustafson never received all the records she wanted. Doc. 124-7 at 2–3.

On December 29, Gallagher Bassett accepted the claim as to medical benefits but not disability benefits (back wages). That day, Gustafson entered in Larson's file, "claim is being accepted, our IME doctor feels mechanism is consistent w/ her injury, stepping off ladder at work is consistent w/ diag. . . . I have gotten applicant's past claims file from auto accidents, etc. None deal with the low back." Doc. 109-3 at 13–14. Similarly, on February 2, 2011, she recorded, "claim accepted. Our IME found claim compensable. No basis for denial we could be looking at bad faith / penalties if not accepted, app [attorney] is R Hommel who is notorious for bad faith. [F]iled the NCS accepting as med only." *Id.* at 2.

Gustafson testified she could not recall any key piece of information she received between September and late December that caused her to reverse the denial as to medical benefits. She "just didn't feel that we should litigate it any further and that we basically didn't have enough after our investigation, so we picked—so I decided to accept the claim." Doc. 109-2 at 20.

Gustafson maintained the denial of disability benefits, but the justification was initially unclear. At oral argument, Defendants clarified: As of December 29, Gallagher Bassett simply did not know Larson's work status or eligibility after mid-September. On February 2, 2011, Gustafson noted she had no records of Larson's medical treatment after September 19, 2010, Doc. 117 at 6, that Larson had been terminated for cause at some unspecified point,[1] and that Larson returned to Denny's on December 30, 2010, and then

---

[1] This was inaccurate. Gustafson testified, "I think that's a typo error because I

resigned on January 26, 2011. Doc. 124-2 at 18. Moreover, in mid-September Sarkisov had prohibited Gallagher Bassett from direct contact with Larson's providers. Doc. 117 at 4.

Larson offers evidence that Gallagher Bassett knew Larson's injury had kept her out of work since July 2010. Gustafson's February 2, 2011 claim file notes record that Larson had been "[o]ut of work since 7-29-10." Doc. 124-2 at 18. On December 1, 2010, and January 6, 2011, Sarkisov provided records of medical treatment from October 14, November 1, November 4, November 8, November 29, December 6, and December 22, 2010. Doc. 121 at 20; Doc. 121-9 at 91–97 (records from October treatment at Abrazo Healthcare sent from Sarkisov to Baker); Doc. 121-9 at 144–69 (records from November and December treatment at Arizona Pain Specialists sent from Sarkisov to Baker). Records from a December 22, 2010 visit to Arizona Pain Specialists include the following provider notes:

> Christy Larson is seen today at the clinic for followup for ongoing issues of low back pain. The patient did undergo two . . . steroid injections. The patient has noted 90% resolution of her pain in that time period. The patient is extremely happy and does wish to go back to work. We did allow her to return to work with no restrictions.

*Id.* at 167.

On January 6, 2011, Sarkisov requested a hearing before the Industrial Commission because Gallagher Bassett maintained the denial of disability benefits. Doc. 109-16 at 5. Gallagher Bassett disputes this. Doc. 124 at 24. The parties also dispute whether Baker sought settlement from Larson in early February. *Compare* Doc. 109 at 12 *with* Doc. 124 at 25. Gallagher Bassett scheduled another IME to "address disability based on the lack of records specifying any off work or restrictions," Doc. 122 at 14, but it accepted the claim as to disability benefits on February 23, 2011, before Larson attended the IME. Doc. 124 at 27.

Larson asserts that Gallagher Bassett's initial denial and subsequent delay before reversing caused the following harm: She could not pay rent, she had to move in with her

---

put here that she resigned. So I know she wasn't terminated. She resigned." Doc. 109-2 at 22.

- 9 -

1. parents, she lived with untreated pain until October when she qualified for AHCCS, and she had to pay a lawyer to represent her at the Industrial Commission. She also seeks damages for emotional distress. Doc. 120 at 16. Defendants dispute that any injuries resulted from their conduct. They assert Larson's own conduct—her failure to sign the medical authorizations—caused the delay. Doc. 125 at 9.

## II.   LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. At its core it questions whether sufficient evidence exists from which a reasonable jury could find in favor of the party opposing the motion. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A material fact is one that might affect the outcome of the suit under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## III. ANALYSIS

### A. Defendants' individual liability

Despite its noninvolvement, Hartford may be liable for Gallagher Bassett's actions since it cannot delegate its duty of good faith. *Walter v. Simmons*, 169 Ariz. 229, 238, 818 P.2d 214, 223 (Ct. App. 1991) ("[W]e hold that, although an insurer may delegate the *performance* of its duty of good faith to a non-servant, it remains liable for the actions taken by this delegate because the *duty* of good faith itself is non-delegable.").

Defendants argue Gallagher Bassett cannot be liable for bad faith because it is a third party claims administrator rather than an insurer—and thus has no insurance contract with Larson or her employer. Doc. 116 at 8–9. California has squarely held that a third party claims adjuster owes no duty of good faith to an insured for lack of contractual relationship. *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 510 P.2d 1032 (1973). And at least one Arizona appellate decision has similarly suggested this is the law in Arizona. *Walter*, 169 Ariz. at 237, 818 P.2d at 222 (stating the duty of good faith is "based on a contractual duty" and noting the plaintiff had voluntarily moved to dismiss the claims adjuster because the latter "owed no contractual duty to act in good faith or deal fairly" with the plaintiff).

In other cases, however, Arizona courts have concluded that third parties with no contractual relationship to the insured could still be liable for bad faith on a joint venturer theory. For example, *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982), "turns upon the idea that the insurer and its agent are engaged in a joint venture so that each is jointly and severally liable with the other for a bad faith refusal to pay," notwithstanding that "the classic elements of a joint venture are missing." *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 11, 699 P.2d 376, 386 (Ct. App. 1984). In *Sparks*, the Arizona Supreme Court extended liability to a third party that "issued certificates of coverage, billed and collected premiums, handled the investigation and payment of claims, and distributed brochures to induce the purchase of policies . . . ." *Farr*, 145 Ariz. at 11, 699 P.2d at 386. In *Farr*, the court of appeals similarly extended liability to a claims adjuster who marketed the insurer's policy, "collected premiums[,] and handled

claims according to guidelines provided by [the insurer]" in a similar situation in which the insurer was generally uninvolved in the claim. *Id.* Like *Sparks*, the adjuster and insurer did not share profits or control. *Id.* Thus, that Larson and Gallagher Bassett lacked privity of contract is not dispositive, and Gallagher Bassett and Hartford may be joint venturers despite not sharing profits and losses. If Gallagher Bassett's conduct constituted bad faith, then both Defendants may be liable for it.

### B. Bad faith

Gustafson informally decided to deny the claim the day she received it, August 9, 2010, formally denied it on September 7, reversed course and accepted the claim as to medical benefits on December 29, and accepted the claim as to disability benefits on February 23, 2011. The parties dispute whether the justifications for the denial and delay were reasonable or pretextual—and thus whether Gallagher Bassett acted in bad faith.

"The core of the duty of good faith and fair dealing is that the insurer act *reasonably* towards its insured." *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1269 (1992). "[A]n insurer that intentionally and unreasonably denies or delays payment breaches the covenant of good faith owed to its insured." *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986). Thus, bad faith liability may attach even when an insurer ultimately pays a claim. *See, e.g.*, *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 734 P.2d 76 (1987); *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572. But failure to pay—or delay in accepting a claim—will not give rise to liability if the "claim's validity is 'fairly debatable' after an adequate investigation." *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572; *see also Farr*, 145 Ariz. 1, 699 P.2d 376. Instead, bad faith is established "if the plaintiff demonstrates that the defendant had knowledge of or recklessly disregarded the lack of a reasonable basis for denying the claim." *Farr*, 145 Ariz. at 5, 699 P.2d at 380.

Bad faith liability thus requires proof of objective and subjective elements. An insurer must act unreasonably and either know it or recklessly disregard whether the actions were reasonable. *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d

125, 134 (Ct. App. 1986) (formulating bad faith as requiring "1) that the insurer acted unreasonably toward its insured, *and* 2) that the insurer acted *knowing* that it was acting unreasonably *or* acted with such reckless disregard that such knowledge may be imputed to it").

The following conduct exemplifies unreasonable behavior: "failure to 'immediately conduct an adequate investigation,' failure to 'act promptly in paying a legitimate claim,' 'forcing an insured to go through needless adversarial hoops to achieve its rights under the policy,' [and] 'lowballing claims.'" *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1004 (D. Ariz. 2013) (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238, 995 P.2d 276, 280 (2000)).

The subjective element requires "the intent to do the act. Mere negligence or inadvertence is not sufficient—the insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds." *Rawlings*, 151 Ariz. at 160, 726 P.2d at 576. Defendants lack the necessary "founded belief that [their] conduct was permissible," *Demetrulias*, 917 F. Supp. 2d at 1005 (quotation marks omitted), where "the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Rawlings*, 151 Ariz. at 160, 726 P.2d at 576.

        1.     <u>Gallagher Bassett's decision to deny and investigate was not bad faith</u>

Defendants state correctly, "It is not unreasonable to delay payment of workers' compensation benefits pending an investigation based on questions regarding the validity of the workers' compensation claim." Doc. 116 at 4. But an "insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Lennar Corp. v. Transamerica Ins. Co.*, 227 Ariz. 238, 246, 256 P.3d 635, 643 (Ct. App. 2011) (quoting *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819, 620 P.2d 141, 146 (1979)). Thus, Larson must ultimately prove Gallagher Bassett knew its denial was groundless or failed to investigate adequately whether the facts supported its denial.

*Rawlings*, 151 Ariz. at 160, 726 P.2d at 576; *see also Demetrulias*, 917 F. Supp. 2d at 1006–07 ("[W]here a plaintiff proceeds on the theory that her claim was denied or delayed because the insurer failed to adequately investigate her claim, the evidence may support both the objective unreasonableness of the insurer's actions and also the existence of the subjective 'evil hand.'").

Gustafson's initial interactions with Larson's claim sufficed to make further investigation reasonable. The day she received the claim, Gustafson heard variations of how the injury occurred and learned that Larson's supervisor doubted the claim. Based on her conversation with Sturm, she also mistakenly believed Larson had not immediately reported the injury. Moreover, the injury itself is improbable. Shortly after beginning her investigation, Gustafson noted the inconsistency between the symptoms and the mechanism of injury. As Sturm relayed to Gustafson, Larson "did not fall or twist her back." Gustafson could reasonably perceive that simply stepping from an object to the floor likely would not injure a woman in her mid-30s. Indeed, both Gustafson's notes and deposition testimony reflect her desire for a medical opinion on causation. Gustafson need not have been suspicious of Larson's claim or motives to decide against immediate acceptance and pursue an investigation. And she need not have simply taken Larson's account at face value. Similarly, that Denny's did not doubt Larson's claim does not determine whether Gustafson could reasonably have had questions about it. Thus, it is not dispositive that Gustafson did not view the claim with suspicion after talking to Sturm, nor that the Form 101 from Larson's file did not question the validity of Larson's claim.

Moreover, Gustafson faced a statutory time constraint. By operation of state law, Larson's claim would be deemed accepted 21 days after Gallagher Bassett received the Industrial Commission's notice of claim:

> If the insurance carrier or self-insurer does not issue a notice of claim status denying the claim within twenty-one days from the date the carrier is notified by the commission of a claim or of a petition to reopen, the carrier shall pay immediately compensation as if the claim were accepted, from the date the carrier is notified by the commission of a claim or petition to reopen until the date upon which the carrier issues a notice of claim status denying such claim.

- 14 -

>Compensation includes medical, surgical and hospital benefits. This section shall not apply to cases involving seven days or less of time lost from work.

A.R.S. § 23-1061(M).

Thus, Gustafson formally denied the claim before she received medical records from the Sierra Vista and High Desert facilities and before the scheduled IME to avoid the deemed-accepted statute. At oral argument, Larson asserted that denial to avoid the statute constitutes bad faith. This goes too far. Preemptive denial does not automatically constitute bad faith if the insurer has reason to investigate the claim, as Gallagher Bassett did here. Gustafson knew she would not receive the IME report before the statutory period ran—and indeed, she did not. An insurer does not act in bad faith by preventing forfeiture of an investigation for which it has a reasonable basis. *See Brown v. Superior Court In & For Maricopa Cnty.*, 137 Ariz. 327, 336, 670 P.2d 725, 734 (1983) ("No matter how the test is defined, bad faith is a question of reasonableness under the circumstances.").

Larson appears truly to have injured herself simply by stepping down from a chair, and Sturm was incorrect both as to the cause of Larson's injury and as to when she reported it. But given the intrinsic improbability of the injury, the initial information Gustafson received, and the statutory constraint she faced, no rational juror could conclude she acted unreasonably by denying the claim and seeking medical records and an IME. *Cf. Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 215, 236 P.3d 421, 442 (Ct. App. 2010), *aff'd*, 226 Ariz. 419, 250 P.3d 196 (2011) ("[A]n insurer's reasonable but incorrect policy interpretation does not, by itself, constitute bad faith."); *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 159, 213 P.3d 288, 308 (Ct. App. 2009) (not automatically bad faith to seek IME).

### 2. Gallagher Bassett's continued search for medical records was not bad faith

By September 22, 2010, Gustafson heard that the IME related Larson's injury to the July 28 incident. Gustafson maintained her denial and continued investigation because of conflicting information in the Sierra Vista and High Desert medical reports and the

- 15 -

1 reference to unloading a truck in the latter.  Gustafson did not receive the complete and
2 written report until October 7.

3 After October 7, Gustafson "maintained the denial in part because she was still
4 waiting on Plaintiff to provide medical authorizations to obtain the prior medical records."
5 Doc. 124 at 37.  Gustafson was entitled to continue to explore whether the injury did not
6 occur at work, not in the improbable way Larson asserted.  She wanted to supply the IME
7 doctor with more than the Sierra Vista and High Desert records.  *Id.* at 44.  Indeed,
8 Gustafson had learned from the Index Bureau search on September 24 of prior claims
9 potentially related to Larson.  Gallagher Bassett sought specific authorization through its
10 administrative counsel, Baker, for medical records related to the claims the Index Bureau
11 search revealed.  *See* Doc. 117-4 at 47 (Gustafson testifying she maintained the denial
12 because "[w]e needed any and all prior medical records, even including the files from these
13 carriers that were found in the Index").

14 Defendants stated the additional records were necessary "to complete the
15 investigation."  *See, e.g.*, Doc. 116 at 5; *see also* Doc. 109-2 at 18 (Gustafson testifying she
16 wanted additional records "to see if there were—there was anything out there").  Gustafson
17 needed the medical records "to determine what was going on prior to the claim."  Doc. 124
18 at 7.  Specifically, Gallagher Bassett sought broad authorization because of (1) "conflicting
19 reports of injury" and (2) the "potential history for lower back complaints."  Doc. 116 at 6;
20 *see also* Doc. 125 at 2 ("[T]he Plaintiff represented that she had no prior back problems
21 [during her August 9 communication with Gustafson], yet the medical records the adjuster
22 was able to obtain reflect prior back problems.  As such, it was important for Defendants to
23 be able to secure a medical authorization to fully investigate Plaintiff's actual medical
24 history.") (citation omitted).

25 It remained reasonable for Gallagher Bassett to pursue these medical records after
26 receiving the IME report and to continue to investigate pretext and other possible causes—
27 matters that the IME could not have investigated beyond Larson's account and the limited
28 records then available to the physician.  But Larson then blocked Gallagher Bassett's further

investigation by refusing consents to obtain other medical records. Larson forced Gallagher Bassett to litigate those consents before the Industrial Commission until December when the administrative law judge directed Sarkisov to obtain the records and allow Baker to review them. Larson "cannot refuse to cooperate and then argue that [her] insurance company committed bad faith by refusing to pay benefits immediately." *Young v. Allstate Ins. Co.*, 296 F. Supp. 2d 1111, 1121 (D. Ariz. 2003). Here Larson herself acted unreasonably by obstructing investigation of her claim by refusing the medical consents.

Larson argues that three features of Arizona's workers' compensation framework made it bad faith for Gallagher Basset to require her medical consents to finish its investigation of her claim before paying. None of her reasons excuses her refusal of the consents. First, in Arizona,

> information obtained by any physician or surgeon examining or treating an injured person shall not be considered a privileged communication, if such information is requested by interested parties for a proper understanding of the case and a determination of the rights involved. Hospital records of an employee concerning an industrial claim shall not be considered privileged if requested by an interested party in order to determine the rights involved. Medical information from any source pertaining to conditions unrelated to the pending industrial claim shall remain privileged.

A.R.S. § 23-908(D). Larson reads this statute to grant an insurer the "right to medical records, on an industrial claim, without a signed release authorization."[2] Doc. 120 at 9. But medical providers do not litigate to release records that the patient herself will not consent to release. It was entirely reasonable for Gallagher Bassett to insist on Larson's consents, and it was bad faith for Larson to refuse them.

---

[2] Because "[m]edical information from any source pertaining to conditions unrelated to the pending industrial claim shall remain privileged," A.R.S. § 23-908(D), Larson asserts records from unrelated conditions are off limits to Gallagher Bassett. She does not offer any authority for this position. Defendants respond persuasively that this provision simply means authorization is required to obtain medical information that is otherwise privileged when it is "relevant to determine whether the injuries were caused by the claimed accident." *See* Doc. 125 at 5. Larson's objection is circular, as it begs the question to say the inquiries were unrelated to her claim without knowing whether they shed light on any medical history pertinent to her condition.

- 17 -

1    Second, Arizona requires the Industrial Commission to "make a Commission claims file relating to a current or prior claim of a claimant available for inspection and copying by any party to any proceeding currently or previously before the Commission involving the same claimant." Ariz. Admin. Code § R20-5-108(B). Thus, Gallagher Bassett had access to the medical records, including those related to prior claims, in the Industrial Commission's possession. But this alone would not have ended the inquiry, and there is still no reason for Larson's refusal of consents and forcing litigation over the consents before the Industrial Commission.

Third, Larson is not allowed to obstruct the insurer's investigation because industrial injuries in Arizona are compensable even if they merely aggravate preexisting injuries. *Mandex, Inc. v. Indus. Comm'n of Arizona*, 151 Ariz. 567, 570, 729 P.2d 921, 924 (Ct. App. 1986) ("We conclude that there is a compensable claim for work-related exacerbation of symptoms that themselves require medical treatment."). Evidence of a preexisting condition that is susceptible to aggravation could support Larson's claim; or exclusion of any history might cast further doubt on her account of how the injury happened. These were honest inquiries.

Because the administrative law judge ultimately required Larson to make her medical records available to Baker, no rational juror could conclude Gallagher Bassett acted unreasonably in seeking them. Where an administrative law judge concludes that the relevance of medical history justifies disclosure to an insurer, seeking that history does not force the insured through "needless adversarial hoops." *Demetrulias*, 917 F. Supp. 2d at 1004 (quoting *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280). With nothing to justify Larson's noncooperation, she cannot assert that Gallagher Bassett's responsive denial constitutes bad faith. As a matter of law, Gallagher Bassett did not act unreasonably in seeking medical records or maintaining its denial until it reviewed them.

3. <u>The legality of Gallagher Bassett's delay in paying disability benefits cannot be decided on this briefing</u>

Gallagher Bassett accepted the claim as to medical benefits on December 29, 2010, but did not accept it as to disability benefits until February 23, 2011. Gallagher Bassett asserts that when it accepted the claim as to medical, it did not know whether Larson was working or otherwise eligible for disability benefits after September 2010. Gustafson's claim notes reflect that Larson had been out of work since July 29, 2010, but also that she had been terminated for cause at some unspecified point. The question then is whether Gallagher Basset knew Larson remained out of work *because of* the industrial injury. *See* Doc. 122 at 8 (Defendants asserting, "It is reasonable for an insurer to investigate whether lost time is due to a work-related injury or due to other factors, such as continued employment with a new employer, a termination or voluntary resignation.")

With respect to bad faith, unclarity of the post–December 29, 2010 facts precludes summary judgment to either party on this record. For the same reason, the Court cannot grant summary judgment to either party on the appropriateness of compensatory and punitive damages for Gallagher Bassett's post–December 29, 2010 conduct.

IT IS THEREFORE ORDERED denying Plaintiff's Motion for Summary Judgment (Doc. 108).

IT IS FURTHER ORDERED granting in part and denying in part Defendants' Motion for Summary Judgment (Doc. 116). As a matter of law, neither Defendants' initial denial and investigation nor continued denial to obtain medical records constituted bad faith.

IT IS FURTHER ORDERED setting the following briefing schedule for a renewed, limited motion for summary judgment as to whether Defendants' conduct between accepting Larson's claim to medical benefits and accepting it to disability benefits constituted bad faith and supports putting punitive damages to a jury:

Defendants' Renewed Motion for Summary Judgment:     July 17, 2014

Plaintiff's Response:                                  July 31, 2014

Defendants' Reply: August 7, 2014

If no such briefing is filed, Larson may submit this limited conduct to a jury and go forward with her claims for compensatory and punitive damages as to that conduct only.

Dated this 3rd day of July, 2014.

_____
Neil V. Wake
United States District Judge